# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: <br><br> REGENT COMMUNICATIONS, INC., *et al.*, <br><br> Debtors. | Chapter 11 <br><br> Case No. 10-10632 (KG) <br><br> Jointly Administered <br><br> **Hearing Date: 4/09/10 @ 10:00 a.m.** <br> **Objection Deadline: 4/02/10 @ 4:00 p.m.** |

## MOTION OF RESILIENT CAPITAL MANAGEMENT, LLC FOR AN ORDER APPOINTING AN EQUITY COMMITTEE

Resilient Capital Management, LLC ("Resilient"), holders of the common stock of Regent Communications Inc. (the "Debtors"), by its undersigned counsel, respectfully submits this motion (the "Motion") for an order appointing an official committee of equity security holders in the above-captioned chapter 11 cases. In support of the Motion, Resilient respectfully represents as follows:

## PRELIMINARY STATEMENT

Resilient, which owns approximately 2,802,193 shares, or approximately 6.6% of the common stock of the Debtors, requests that an official committee of equity holders be appointed immediately for the purpose of securing independent representation for public shareholders at this crucial stage of this chapter 11 proceeding.

In their proposed plan of reorganization (the "Plan"), the Debtors[1] seek to cancel all of the equity interests but propose a "gift" recovery to holders of equity interest in the form of a pro

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Regent Communications, Inc., a Delaware corporation (2857); B & G Broadcasting, Inc., a Delaware corporation (9111); Livingston County Broadcasters, Inc., an Illinois corporation (2024); Regent Broadcasting, LLC, a Delaware limited liability company (1632); Regent Broadcasting Management, LLC, a Delaware limited liability company (5451); Regent Broadcasting of Albany, Inc., a Delaware corporation (7566); Regent Broadcasting of Bloomington, Inc., a Delaware corporation (2658); Regent Broadcasting of Buffalo, Inc., a Delaware corporation (7815); Regent Broadcasting of Chico, Inc., a Delaware corporation (1263); Regent Broadcasting of Duluth, Inc., a Delaware corporation (9495); Regent Broadcasting of El Paso, Inc., a Delaware

1

rata share of $5.5 million, which will come from the holders of First Lien Debt Claims. Under the Plan, equity interest holders are supposedly "out of the money" based upon a valuation prepared by Oppenheimer & Co. Inc. ("Oppenheimer").

Resilient submits that Oppenheimer's valuation is faulty and that the Debtors' equity retains significant value even with the company in bankruptcy. The issue going forward in these cases is not whether the Debtors' are solvent, but how best to utilize the chapter 11 process to maximize and preserve the Debtor's substantial going-concern value for the benefit of the Debtors' estates, including existing equity holders. In order to achieve this outcome, the appointment of an equity committee is essential.

While in theory, the Debtors' have a fiduciary duty to maximize asset values for the benefit of their shareholders, in practice the chapter 11 process does not ensure that equity interests are fairly represented by the debtor's management. In these cases, the Debtors have indicated that their primary concern is the confirmation of a plan of reorganization, which is

---

corporation (1469); Regent Broadcasting of Erie, Inc., a Delaware corporation (8859); Regent Broadcasting of Evansville/Owensboro, Inc., a Delaware corporation (9510); Regent Broadcasting of Flagstaff, Inc., a Delaware corporation (3259); Regent Broadcasting of Flint, Inc., a Delaware corporation (6474); Regent Broadcasting of Ft. Collins, Inc., a Delaware corporation (9503); Regent Broadcasting of Grand Rapids, Inc., a Delaware corporation (6790); Regent Broadcasting of Kingman, Inc., a Delaware corporation (3260); Regent Broadcasting of Lafayette, LLC, a Delaware limited liability company (5450); Regent Broadcasting of Lake Tahoe, Inc., a Delaware corporation (1261); Regent Broadcasting of Lancaster, Inc., a Delaware corporation (9505); Regent Broadcasting of Lexington, Inc., a Delaware corporation (0854); Regent Broadcasting of Mansfield, Inc., a Delaware corporation (6796); Regent Broadcasting of Midwest, LLC, a Delaware limited liability company (5369); Regent Broadcasting of Palmdale, Inc., a Delaware corporation (5821); Regent Broadcasting of Peoria, Inc., a Delaware corporation (9348); Regent Broadcasting of Redding, Inc., a Delaware corporation (1262); Regent Broadcasting of San Diego, Inc., a Delaware corporation (3044); Regent Broadcasting of South Carolina, Inc., a Delaware corporation (3151); Regent Broadcasting of St. Cloud, Inc., a Delaware corporation (9265); Regent Broadcasting of St. Cloud II, Inc., a Minnesota corporation (6304); Regent Broadcasting of Utica/Rome, Inc., a Delaware corporation (1480); Regent Broadcasting of Watertown, Inc., a Delaware corporation (1476); Regent Broadcasting West Coast, LLC, a California limited liability company (8962); Regent Licensee of Chico, Inc., a Delaware corporation (1681); Regent Licensee of Erie, Inc., a Delaware corporation (8861); Regent Licensee of Flagstaff, Inc., a Delaware corporation (1677); Regent Licensee of Kingman, Inc., a Delaware corporation (9969); Regent Licensee of Lake Tahoe, Inc., a Delaware corporation (2685); Regent Licensee of Lexington, Inc., a Delaware corporation (5710); Regent Licensee of Mansfield, Inc., a Delaware corporation (8147); Regent Licensee of Palmdale, Inc., a Delaware corporation (1678); Regent Licensee of Redding, Inc., a Delaware corporation (1679); Regent Licensee of San Diego, Inc., a Delaware corporation (3036); Regent Licensee of South Carolina, Inc., a Delaware corporation (3136); Regent Licensee of St. Cloud, Inc., a Delaware corporation (9266); Regent Licensee of Utica/Rome, Inc., a Delaware corporation (1482); and Regent Licensee of Watertown, Inc., a Delaware corporation (1477).

heavily dependent upon the support of the Debtors' prepetition lenders. These creditors have no incentive to ensure that equity holders receive fair value. Debtors cannot adequately represent the interest of equity while maintaining the support of their creditor constituents for the existing plan process.

If an equity committee is appointed, Resilient and other equity holders will be able to meaningfully participate in plan negotiations, potentially increasing the return to equity holders and ensuring the adequate representation of their interests at a time when others will likely seek to disregard their potentially substantial value. Notably, in contrast to the extreme prejudice that would occur if equity holders are not provided a seat at the table now, the cost of appointing an equity committee would be minimal. Accordingly, and for the reasons more fully set forth herein, Resilient respectfully requests that an equity committee be appointed promptly and that shareholders be provided the representation to which they are entitled under section 1102(a)(2) of the Bankruptcy Code.

## BACKGROUND

1. On March 1, 2010 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

2. Also on the Petition Date, the Debtors filed their Joint Plan of Reorganization (Docket No. 35) and their related Disclosure Statement (Docket No. 36).

3. On March 22, 2010, the Debtors filed an Amended Joint Plan of Reorganization (Docket No. 127) and a related Disclosure Statement (Docket No. 128).

4. The Section 341 meeting of creditors is scheduled for March 31, 2010. No committee of unsecured creditors has yet been appointed. No trustee or examiner has been appointed in these cases.

### The Prepetition Lenders Seek to Acquire the Debtors' Equity Pursuant to a Pre-Negotiated Plan of Reorganization

5. Prior to filing their Petitions, the Debtors negotiated the terms of the Plan with two of their major prepetition lenders, General Electric Capital Corporation and various affiliates of Oaktree Capital Management, L.P., who together own approximately 76.3% of the outstanding first lien debt claims. Pursuant to the terms of the Plan, the holders of the first lien debt claims are impaired and are not being paid in full in cash. The Plan provides that general unsecured creditors will be paid in full and that existing equity holders will receive a "gift" recovery in the form of their pro rata share of $5.5 million in cash, despite being "out of the money."

6. With respect to holders of equity interests, the Plan provides that equity interests held in the parent company will be cancelled and the holders will receive their pro rata share of $5.5 million in cash.

7. The support for the Plan was evidenced by the Restructuring Support Agreement between the Debtors and the holders of at least 76.3% of the principal amount of the loans outstanding under certain agreements. These holders have agreed to exercise all votes to which they are entitled to accept the Plan.

8. The financial transactions under the Plan are comprised of two distinct elements: (a) the recapitalization and restructuring of the Debtors' balance sheets; and (b) the reconstitution of the Debtors' governance and corporate structure.

{00002943.}

## JURISDICTION AND VENUE

9. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (D). Venue of this proceeding and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicate for relief sought herein is section 1102(a) of the Bankruptcy Code.

## RELIEF REQUESTED AND THE REASONS THEREFOR

10. As more fully set forth below, the facts of these cases demonstrate that the appointment of an official committee of equity holders is warranted. Section 1102(a)(2) of the Bankruptcy Code provides that "on a request of a party in interest, the court may order the appointment of additional committees ... of equity security holders if necessary to assure adequate representation of creditors or of equity security holders" 11 U.S.C. § 1102(a)(2). In providing shareholders with the right to seek the appointment of an official committee, Congress recognized the potential prejudice to equity holders from the chapter 11 process and noted that an equity committee could "counteract the natural tendency of a debtor in distress to pacify large creditors, with whom the debtor would expect to do business, at the expense of small and scattered investors." S. Rep. No. 95-989 at 10 (1978). Congress appropriately viewed reorganization proceedings as "literally the last clear chance to conserve values [for equity holders] that corporate financial stress or insolvency had placed in jeopardy." *Id.*

11. The Bankruptcy Code does not provide a bright-line standard for the appointment of an equity committee. However, courts have applied the following factors in determining whether to appoint an equity committee under section 1102(a)(2): (i) whether Debtors are likely to prove solvent; (ii) whether equity is adequately represented by stakeholders already at the table; (iii) the complexity of the Debtors' cases; and (iv) the likely cost to Debtors' estates of an equity committee. *See, e.g., In re Pilgrim's Pride Corp.*, 407 B.R. 211 (Bankr. N.D. Tex. 2009);

5

*In re Kalvar Microfilm*, 195 B.R. 599 (Bankr. D. Del. 1996); *In re Wang Lab., Inc.*, 149 B.R. 1 (Bankr. D. Mass. 1992). Here, each of these factors favors the establishment of an equity committee.

### A. The Debtors Are Likely Solvent

12. In order to support their Plan, Debtors rely upon the valuation performed by Oppenheimer, which relied on only five out of the eight comparable companies in the radio industry identified by Oppenheimer. The arbitrary selection of this subset of comparable companies artificially depressed Oppenheimer's valuation conclusions.

13. According to the Disclosure Statement and the Amended Disclosure Statement, Oppenheimer utilized a multiple range of seven to eight times the latest twelve month EBITDA based upon those five comparable companies. However, these five companies trade at lower multiples than would be warranted for Debtors, in part, due to the fact that these five companies are much larger than Debtors. In addition, the last twelve month average EBITDA multiple for those five companies was 9.36 times EBITDA, and the average EBITDA of the five companies used by Oppenheimer was $69.1 million.

14. Indeed, the three companies eliminated from Oppenheimer's valuation were the three companies with the highest, latest twelve month EBITDA multiples. These were also the three of the companies closest in size to Regent. Their average EBITDA of $28.9 million, is closer to Regent's EBITDA for 2009 (estimated at $19.8 in the Disclosure Statement) than the $69.1 million average EBITDA for the five companies utilized by Oppenheimer.

15. If Oppenheimer had derived its EBITDA multiple from the full set of comparable company data, the EBITDA multiple would have – and should have – been 11.02 times the latest twelve months of EBITDA.

16. Oppenheimer valued the Debtors' estates at $160 million (midpoint of range from $150-$170 million). Based on the Oppenheimer valuation, the net asset value available for common shareholders is approximately negative fifty million dollars, based on the Disclosure Statement's assertion that the Debtors' liabilities include $206.7 million in pre-petition liabilities and $3.9 million needed for restructuring costs. Despite the supposed negative value for equity according to the Oppenheimer analysis, the Disclosure Statement and Plan nonetheless propose a "gift" of $5.5 million ($0.128 per share) to the shareholders.

17. Using all eight of the comparable companies identified by Oppenheimer to derive an appropriate multiple, the comparable company analysis should have yielded positive value for shareholders (after deducting $206.7 million in pre-petition liabilities outstanding and $5 million for restructuring costs) of $36 million (based on EBITDA comparable multiple of 11.02 times). Based on the 43 million shares outstanding, the net asset value per share of common stock is approximately $0.83 cents per share. This includes value for the NOL ($18 million) and cash of $11 million.

18. Resilient's own discounted cash flow ("DCF") valuation of the Debtors results in net asset value available to the common equity holders of $57 million, after deducting $206.7 million of pre-petition liabilities outstanding and $5 million for restructuring costs. Based on the 43 million shares outstanding, the net asset value per share is approximately $1.32 cents per share. This analysis is based on taxing unlevered income at a 40% tax rate and discounted cash flows at an 11% rate, a discount rate utilized by Oppenheimer in its own analysis.

19. Because there is a substantial likelihood that there is sufficient equity value in the Debtors to distribute to the common equity holders, an equity committee should be formed to protect those shareholders' interests. *See In re Spansion, Inc.*, 2009 Bankr. LEXIS 3958 at *10

{00002943.}

(Bankr. D. Del. 2009) (stating that the formation of an equity committee is appropriate where "there is a substantial likelihood that they will receive a meaningful distribution in the case under a strict application of the absolute priority rule").

### B. Equity Holders Will Not Be Adequately Represented Without the Appointment of an Equity Committee

20. Equity holders will not be adequately represented in these cases without the appointment of an official committee. Resilient cannot rely on the Debtors or other parties in interest to protect their economic interests for them. As one court recently noted:

> The dynamics of chapter 11 are such that Debtors—and their management—are likely to be constrained to accept and advocate to the court a conservative value of their business in order to obtain creditor assent to a reorganization plan. If [management] is faced with the choice of holding out for the benefit of equity and risking a failure of the reorganization or accepting a restructuring that values Debtors excessively conservatively, despite their interest in maximinzing stock value, they may have little choice but to adopt the latter alternative.

*In re Pilgrim's Price Corp.*, 407 B.R. 211, 219 (Bankr. N.D. Tex. 2009). Here, management is incentivized to go ahead with the proposed Plan of reorganization because it is likely to gain if the Plan is confirmed.

21. Going forward, these parties have no incentive to ensure that equity holders receive fair value. In fact, and as noted above, management has a vested interest in freezing equity holders out of the process altogether so that it can realize the Debtors' going-concern value upon Debtors' emergence from bankruptcy at the expense of the Debtors' equity holders, whose interests are terminated if the proposed Plan is approved. As such, the Debtors will be unable to adequately represent the interests of equity while maintaining the support of their creditor constituents for the existing plan process.

22. For example, according to the term sheet, management will get 8% of the new company, and the existing banks will get new debt of approximately $120 million and all of the remaining equity of the new company.

23. According to the last proxy statement dated April 30, 2009: William L. Stakelin, the CEO, held 1,357,146 shares or 3.16% of the company. Of these shares, 650,089 shares were in the form of options whose strike price ranged from $5.00-$7.76. Given that the market value of Debtors' shares are well below the option strike price, for all practical purposes this gave Mr. Stakelin a true equity interest in the company of 707,057 shares or approximately 1.6% of the company.

24. Anthony A. Vasconcellos, the CFO, held 842,240 shares or 1.97% of the company. This includes 425,000 shares of stock options whose strike price ranged in price from $5.33-$7.76 per share. Since Mr. Vasconcellos' options are also "out of the money," it is appropriate to view his stake in the company as equal to 1.0% of the company's outstanding shares.

25. Between the two senior managers, they held 2.61% of a company with $206 million of debt. In exchange, under the proposed Plan, they will get 8% of a company with only $120 million of debt. In addition, adding insult to injury, it appears as though Mr. Stakelin and Mr. Vasconcellos will get cashed out of their existing stock and get almost 3% of the $5.5 million allocated for distribution to shareholders under the current Plan.

26. Moreover, individual equity holders lack the resources that are critical to the fair representation of their interests during this important stage of this proceeding, and that only an equity committee can provide. An official committee enjoys access to documents and information that is not afforded to private parties. Equity holders simply cannot protect their

rights as the plan process develops in the coming weeks without the knowledge that comes from being an official participant in these cases. Further, an official committee is far better suited to represent the interests of equity than a scattered and disparate band of a few shareholders, who would each have to bear extensive costs in order to play a meaningful part in the plan process. This is particularly true in light of the fact that all of the professionals of the other major constituents of the Debtors are being paid out of the estate.

27. Furthermore, the common shareholders are restricted from operating as a group pursuant to Section 13(d) of the Securities Exchange Act of 1934. In this case, large shareholders are restricted from becoming larger by the Debtors pursuant to the Final Equity Securities Trading Order, Docket No. 119, thereby inhibiting a shareholders' ability to get economies of scale out of working with others or increasing the size of their position.

28. Without the formation of an equity committee, the Debtors' equity holders are at a material financial and informational disadvantage, and cannot ensure the adequate representation of their meaningful economic interest in these estates. As such, this factor supports granting the Motion.

## C. The Appointment of an Equity Committee Is Warranted by the Complexity of These Cases

29. There can be no doubt that these cases are exceedingly complex. The Debtors' operations include 50 FM and 12 AM radio stations divided into 13 markets in Colorado, Illinois, Indiana, Kentucky, Louisiana, Michigan, Minnesota, New York and Texas. In 2008, Debtors generated net revenue of approximately $92.8 million, and in 2009, Debtors generated net revenue of approximately $80.5 million.

30. Accordingly, it is appropriate to appoint an equity committee to oversee the interests of the common equity holders.

### D. The Costs of an Equity Committee Are Greatly Outweighed by the Prejudice to Equity Holders from the Lack of Formal Representation in These Cases

31. The cost of a committee, which is anticipated to be relatively modest in the overall scheme of these proceedings, is greatly outweighed by the prejudice to equity holders form a lack of formal representation at this crucial point in the process. Resilient recognizes that the cost of an equity committee's professionals is always a factor. However, "costs alone cannot and should not deprive public debt and security holders of representation." *In re McLean Indus. Inc.*, 72 B.R. 852, 860 (Bankr. S.D.N.Y. 1987). Moreover, because the Debtors are seeking confirmation of a plan in just a few weeks, the equity committee will be in existence for only a short time and will incur only limited professional fees.

32. In contrast, if an official equity committee is not appointed immediately, the prejudice to equity holders will be significant. Resilient and other equity holders plainly have a material economic interest in these estates, and are entitled to a seat at the table as plan negotiations move forward in earnest. Accordingly, this factor weighs in favor of granting the Motion.

### NOTICE

33. Notice of this Motion has been provided to counsel to the Debtors; the Acting United States Trustee for the District of Delaware; counsel for the administrative agent to the prepetition lenders; counsel to Oaktree Capital Management, L.P.; counsel for General Electric Capital Corporation; and all parties that have requested notice in these cases. Based on the nature of the relief requested, Resilient respectfully submits that no further notice is necessary or required under the circumstances.

{00002943.}

**WHEREFORE**, Resilient respectfully requests that this Court enter an order directing the U.S. Trustee to appoint an official committee of equity security holders forthwith, and granting such additional relief as is just.

Dated: March 23, 2010
      Wilmington Delaware

Respectfully submitted,

**MESSANA ROSNER & STERN LLP**

/s/ *Frederick B. Rosner*
Frederick B. Rosner (DE #3995)
Scott J. Leonhardt (DE #4885)
1000 N. West Street • Suite 1200
Wilmington, Delaware 19801
Tel:   (302) 295-4877

**BUTZEL LONG, a professional corporation**
Eric B. Fisher (*pro hac vice* pending)
Orlee Goldfeld (*pro hac vice* pending)
380 Madison Avenue
New York, New York 10017
(212) 818-1110
fishere@butzel.com

*Counsel for Resilient Capital Management, LLC*